BLANK ROME LLP
A Pennsylvania LLP
SETH J. LAPIDOW
JONATHAN M. KORN
New Jersey Resident Partners
301 Carnegie Center, 3rd Floor
Princeton, New Jersey 08540
(609) 750-7700 (phone)
(609) 750-7701 (fax)
Lapidow@BlankRome.com
Korn@BlankRome.com

*Attorneys for Plaintiff
Diane E. Metcalf-Leggette*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DIANE E. METCALF-LEGGETTE,<br><br>                            Plaintiff,<br><br>v.<br><br>PRINCETON UNIVERSITY,<br><br>                            Defendant. | Hon.<br><br>Civil Action No.<br><br>**VERIFIED COMPLAINT** |

**PRELIMINARY STATEMENT**

1.  This action is brought under Title III of the Americans With Disabilities Act of 1990 ("ADA" or "Act"). 42 U.S.C. § 12188(a) (incorporating the "remedies and procedures set forth in" 42 U.S.C. § 2000a-3(a)). It seeks preventative injunctive relief, attorneys fees, costs, and other expenses allowed by statute, for the unlawful refusal of Princeton University to grant 100 percent extended time (that is, double time) on examinations as a reasonable accommodation for the plaintiff's learning disabilities. Section 12188(a)(1) is a special statutory remedy which favors as a remedy "a permanent or temporary injunction, restraining order, or other order" to restrain "any person . . . about to engage in any act or practice" violating Title III of the ADA.

42 U.S.C. § 2000a-3(a). It authorizes this Court power to grant injunctive relief requiring "modification of a policy, or provision of alternative methods" to ensure compliance with the Act.

## PARTIES

2. Plaintiff, Diane Elizabeth Metcalf-Leggette, is a resident of Centreville, Virginia. Ms. Metcalf-Leggette demonstrated the qualifications needed to satisfy the standards for admission to Princeton University. She matriculated in September 2009 as a member of the Class of 2013. She is a member of Princeton University's women's intercollegiate soccer team.

3. Ms. Metcalf-Leggette is learning disabled. Following her 2003 diagnoses of multiple learning disabilities, she received numerous accommodations, including extended time for tests, from her private school. She graduated with academic honors in 2009. Ms. Metcalf-Leggette received accommodations, including 100% extended time, from the administrators of the Scholastic Aptitude Test ("SAT"). For the "ACT" test (administered by ACT, Inc.) she was granted "up to triple time for each test (over multiple days)." The SAT and ACT are the two most commonly used standardized tests for college admission. (a copy of Plaintiff's 2008-2009 Learning Support Plan from her secondary school annexed hereto as Exhibit A; copies of letters dated January 23, 2008 from the College Board and December 20, 2007 from ACT are annexed hereto as Exhibit B).

4. Defendant Princeton University is a not-for-profit corporation. Princeton University is located in Princeton, New Jersey, within this judicial district.

5. Princeton University is a private university whose operations affect commerce, within the meaning of Title III of the ADA.

6. Princeton University's Undergraduate Announcement for the 2009-2010 academic year acknowledges that the University is subject to the ADA. (a copy of Princeton University's Undergraduate Announcement, 2009-10 is annexed hereto as Exhibit C).

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331. No statute requires the plaintiff to exhaust administrative remedies before bringing this action.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

9. Plaintiff was first diagnosed with learning disabilities in 2003, while she was a student at The Wakefield School in The Plains, Virginia. At Wakefield, Plaintiff received several accommodations, including 100% extended time on examinations. (Exhibit A).

10. Plaintiff has been diagnosed with many learning disabilities and with Attention Deficit Hyperactivity Disorder. These disabilities has resulted in Plaintiff devoting years of work with tutors, learning specialists and therapists in order for her to cope with them and be successful in school. (a copy of the July 31, 2009 Educational and Psychological Re-Assessment from 2007, written by John W. Wires, Ph.D., is annexed hereto as Exhibit D).

11. Plaintiff's disabilities effect her ability to take tests in a number of ways.

12. Plaintiff has been diagnosed with Mixed Receptive - Expressive Language Disorder. (*Id.* at page 5). This disorder is a learning disability in which a person's ability to comprehend language, express language, or recall previous material is substantially limited, based on the individual's age, intelligence, life experiences, educational background, or physical impairments. Plaintiff struggles significantly with "sequencing," which means that she has

difficulties comprehending complex information in a sentence. Because of this disability, plaintiff must read each sentence four or five times before she understands it. In addition, plaintiff has difficulty creating a concept of what she reads and holding it in her memory. Plaintiff grapples with new information and must consciously think about it in relationship to other information she already knows. In some instances, this means she must write down material she previously learned to make sense of the new information. Additionally, when testing, plaintiff must constantly compare the question presented, related reading passages, and her answer. When dealing with spatial information, plaintiff must isolate the material and process it in small increments. The strategies plaintiff employs to overcome this disability are extremely time consuming, and, in a timed testing situation, places her at a severe disadvantage in comparison with her peers who do not have this disability.

13.  Plaintiff has been diagnosed with Disorder of Written Expression. (*Id.*). This disorder is a learning disability in which a person's ability to communicate in writing is substantially below the level normally expected based on the individual's age, intelligence, life experiences, educational background, or physical impairments. This disability affects both the physical reproduction of letters and words and the organization of thoughts and ideas in written compositions. Because she suffers from this disorder, plaintiff must pay careful attention to all of the sentences and paragraphs that she composes, going back and forth many times to double check the material that she writes.

14.  Plaintiff has been diagnosed with Developmental Coordination Disorder. (*Id.*). This disorder is a learning disability in which a person's ability to spell, punctuate and form sentences is substantially below the level normally expected based on the individual's age, intelligence, life experiences, educational background, or physical impairments. The deficits

plaintiff experiences in coordinating her reading and writing make it hard for her to produce written work. To overcome this challenge, plaintiff isolates key words in test questions and key concepts in longer reading passages, and highlights them so she can locate them again easily. This process takes a great deal of time, as sometimes she must read the material several times in order to make this identification. People without this disability typically do not have to read the same passages multiple times in order to understand key concepts. Also due to this disorder, plaintiff's visual-motor processing skills are significantly impaired. Even under untimed conditions, her performance on the visual-motor integration test (VMIT) received a standard score of 77, in the sixth percentile. Being in only the sixth percentile places her far below the average person, let alone the typical Princeton University student. This visual impairment places great strain on plaintiff's eyes. The time that it takes her to move back and forth in the test is very tiring visually and she must consciously focus her efforts. Because of the strain, she occasionally must rest her eyes. Persons without these visual processing deficits typically do not spend test-time addressing eye fatigue.

15. Plaintiff has been diagnosed with Attention Deficit Hyperactivity Disorder. (*Id.*). This disorder affects plaintiff's ability to focus on her work. If plaintiff is distracted, she must go back to the start of the task. When this involves reading, it means she can spend a great deal of time starting over, and collecting key concepts from the written material. When taking a test, she uses something called a "graphic organizer" to keep track of her thoughts. This means that she create diagrams of information in a way that helps her to keep concepts and key ideas clearly organized. It takes extra time for plaintiff to do diagram her graphic organizer, but in doing so, she ensures that she hasn't lost information that is pertinent to the question she is answering. It is especially important for plaintiff to use graphic organizers when she is working with essay

questions, or questions that require her to work with very complex information. Additional testing time is extremely important for plaintiff because she must organize the questions and her responses in a graphic form in order to retain the information in her memory.

16. Plaintiff disclosed her learning disabilities to Princeton University during the application process.

17. On August 13, 2009, pursuant to Princeton University procedures, plaintiff submitted a documented request for accommodations to Princeton University's Office of Disability Services (ODS), which included a request that she be given "100% extended time" on examinations and similar "assessments" of her knowledge of the subject matter of her coursework. (A description of plaintiff's disorders submitted with her August 13, 2009 request is annexed hereto as Exhibit E). The request contained proof of her disabilities from a Virginia-licensed Clinical Psychologist/Neuropsychologist, with recommendations for accommodations, including 100% extended time. (Exhibit D). Among other things, it also demonstrated that she had received 100% extended time for the Scholastic Aptitude Test and "triple time" (200% extended time) for the ACT standardized test. (Exhibit B).

18. Early in September, plaintiff received a letter dated September 3, 2009 from Eve Tominey ("Tominey"), Director of ODS. The letter acknowledged that ODS had reviewed the "clinical documentation" plaintiff submitted in August, and had that documentation "reviewed by our external consulting psychologist." The letter indicated that several accommodations "may be beneficial to you," identifying those as "a reduced distraction testing environment, e-text, rest breaks, use of computer[,] and one exam per day limit." (A copy of Tominey's September 3, 2009 letter is annexed hereto as Exhibit F).

19. However, the September 3, 2009 letter also stated "that your request for extended time would not be warranted as your disability does not demonstrate that you are disabled in your ability to learn in comparison to the general population." Tominey added that "I would like to set up an intake interview with you to discuss your documentation and gather any additional pertinent information."

20. ODS announced its decision in a meeting with plaintiff on September 15, 2009, in Tominey's office. Present with the plaintiff were her mother, Kathleen Leggette, and the Head of Learning Support from plaintiff's secondary school, Dr. Robin Amrit-Marie Kasten-Daryanani. (*See* Declaration of Dr. Robin Amrit-Marie Kasten-Daryanani ("Daryanani Declaration") at ¶ 8).

21. During this meeting, Tominey acknowledged that plaintiff is disabled and that, accordingly, she would receive the accommodations identified in her September 3, 2009 letter to address the limitations plaintiff suffers from those disabilities.

22. Tominey denied plaintiff's request for 100% extended time on examinations, on the ground that plaintiff is not disabled in her ability to learn.

23. Dr. Daryanani asked Tominey to explain that conclusion, in light of plaintiff's test scores on a standard performance test called the Test of Variables of Attention (TOVA), which were contained in the clinical documentation submitted to Princeton University.

24. Tominey did not respond to Dr. Daryanani's request, but instead advised plaintiff that it was Princeton University's policy not to afford extended time to students with learning disabilities. She added that, in adopting that policy, Princeton University was following a standard adopted throughout Ivy League institutions, by the administrators of the Graduate Record Examination, and by the administrators of the Law School Aptitude Test.

25. Plaintiff's older brother, David Metcalf, graduated from Princeton University as a member of the Class of 2008. He, too, had learning disabilities. Princeton University had afforded Mr. Metcalf several accommodations for his disabilities, including 100% extended time on examinations. Tominey acknowledged in the meeting that the University had done so, but indicated he had received that accommodation before she became Director of ODS. She had chosen, she said, to continue his accommodation as "a courtesy."

26. Tominey offered to "work with" plaintiff so that she would develop skills to overcome her learning disabilities. Plaintiff asked Tominey if Princeton University would grant her extended time on examinations until she had mastered those skills. Tominey stated she was unable to allow the accommodation even for a limited period of time.

27. Moreover, the skills Tominey described as being of potential value to plaintiff were ones plaintiff had already developed through The Wakefield School. Despite these skills, plaintiff still required extended time on examinations to implement those strategies. (Exhibit A).

28. Tominey indicated that only eight other students were receiving services through ODS and that none of these eight were afforded extended time on examinations.

29. During the meeting, Tominey told Plaintiff several times that the decision not to offer extended time was an Ivy League policy that had been made in concert with "the other Ivies." She stated, "We [her colleagues at the other universities] meet regularly to discuss these issues."

30. Tominey encouraged plaintiff to select courses at Princeton University in which grades were not substantially based on timed examinations. Tominey also advised plaintiff to drop a course in which she had already enrolled, called Princeton Readings, because her

disabilities would keep her from being successful in a course with so much reading. Plaintiff dropped Princeton Readings.

31. Plaintiff met with University Counsel Hannah Ross ("Ross") on September 19, 2009. Present with the plaintiff again were her mother and Dr. Daryanani.

32. Ross began by repeating ODS's conclusion that plaintiff was not disabled in her ability to learn relative to the general population. Later in the meeting, however, she stated to plaintiff's mother, "Let me be clear, Mrs. Leggette, we acknowledge Diane is disabled. We, here at Princeton, don't offer extended time on exams as an accommodation." Ross stated that they do not need to give the accommodation of extended time if it harms the "essence" of a Princeton education. Ross stated that a major component of a student's education a Princeton University is independent study and meeting deadlines. Ross further added that Princeton University intended to publish a written statement articulating this philosophy, as well as expressing the "essence" of a Princeton education, so that prospective disabled students would be on notice of Princeton University's philosophy on providing extended time for completion of examinations "and would then make their decisions accordingly."

33. Ross advised the plaintiff that if she wished to pursue legal remedies, Ross would "be happy" to provide plaintiff's counsel with copies of judicial precedent supporting the Princeton University's policies on accommodations. Ross made additional remarks indicating that any effort by plaintiff to challenge the denial of extended time would likely be unsuccessful.

34. At the conclusion of the meeting, Ross addressed to plaintiff's mother the comment that "Mrs. Leggette, I realize that you are most attached to this accommodation, but she did receive other accommodations."

35. By email dated September 22, 2009, Ross advised plaintiff that the anticipated statement reflecting Princeton University's philosophy on the provision of extra time to disabled students and the "essence" of a Princeton education had been published in Princeton University's Academic Standing and Regulations section of the 2009-2010 Undergraduate Announcement. Ross copied for plaintiff's reference the language which Ms. Ross believed set forth the policy against extended time. In relevant part, the language states: "[s]tudents are expected to be active participants in their education; the development of critical study and life skills, such as working independently, managing competing obligations, and completing work in a timely fashion, is an essential education goal. Students are expected to observe all University deadlines . . . and may not carry incompleted courses into a subsequent semester." (a copy of Ross' September 22, 2009 email is annexed hereto as Exhibit G).

36. Within a few days of the meeting with Ross, and as requested by ODS, plaintiff signed a form entitled "Acceptance of Services." The form indicated plaintiff had been approved for a total of six accommodations. Five of these (as explained in the following paragraph) required implementation by plaintiff's professors. The sixth was the responsibility of ODS: to provide "E-text materials for use with screen reading software or alternate format textbooks[.]" The accommodations did not include 100% extended time. Plaintiff's signature was understood by ODS to be without prejudice to her opportunity to appeal the denial of extended time within the University process. (A copy of the Acceptance of Services form Plaintiff signed is annexed hereto as Exhibit H).

37. In a memorandum dated October 7, 2009, Tominey advised plaintiff's four professors that the "Office of Disability Services (ODS) has determined that this student is eligible to receive academic accommodations." The memorandum listed five accommodations.

Among the list were limiting exams to one per day, a reduced-distraction test location, and "rest breaks of 10 minutes per hour . . . on lengthy examinations as needed." The list did not include 100% extended time for examinations. The memorandum requested that the professors "not grant the student any accommodations not authorized by ODS. Through this interactive process you will assist him/her in *minimizing the effects of the disability* and maximizing the opportunity for academic success." (Emphasis added.) (a copy of Tominey's October 7, 2009 memorandum is annexed hereto as Exhibit I).

38. By letter dated October 13, 2009, plaintiff filed a "University appeal" with the University's Vice Provost for Institutional Equity and Diversity. Plaintiff hand-delivered the appeal on the morning of October 14, 2009. (a copy of Plaintiff's October 13, 2009 University appeal letter is annexed hereto as Exhibit J).

39. In addition to explaining why Princeton University's denial of her request for 100% extended time violated her rights under federal law, plaintiff's letter also included:

    A.    Reference to an article appearing in December 2000 in the student newspaper, *The Daily Princetonian*, quoting Tominey's predecessor that the University did grant extended time in appropriate cases to students with learning disabilities.

    B.    Evidence from the websites of the seven other Ivy League institutions demonstrating that each grants extended time in appropriate cases to students with learning disabilities.

    C.    A June 2009 peer-reviewed report of the National Institute for Literacy, an agency of the government of the United States, surveying published peer-reviewed studies and concluding: "For many adolescents and adults with LD [learning disabilities], extra time during test taking has proven to be an extremely effective accommodation."

    D.    A complete copy of the Undergraduate Announcement for the Academic Year 2009-10. Plaintiff quoted language from the Announcement which Ross had not included in her September 22 email regarding University policy:

>   "Princeton University is committed to providing reasonable accommodations for enrolled students with documented disabilities that are balanced with the University's need to maintain the essential nature of the undergraduate academic program. ODS's goal in providing accommodations for students with disabilities is to ensure that their academic and co-curricular experience is equitable to that of all students."

>   E.  A thorough explanation of why and how plaintiff's disabilities limit her ability to demonstrate her knowledge of subject matter of a given course in a timed examination, and that she faces limitations uncommon to the general population of Americans.

40. At plaintiff's request, plaintiff's counsel called Princeton's General Counsel, Peter McDonough, on October 20, 2009, to advise that plaintiff's first timed examination would be held on October 27, 2009. Mr. McDonough was unavailable. At his request, Ross returned the call. In exchanges of communication with Ross, plaintiff's counsel advised that plaintiff had midterm examinations in all four of her classes during the week of October 26, 2009. Counsel asked Princeton University to consider granting plaintiff the accommodation of 100% extended time for the four midterms, without prejudice to the University's position to continue to contest plaintiff's claims if the University chose to deny her appeal to the Vice Provost. Counsel also accepted Ross' offer to plaintiff to provide her counsel with the authorities which she believed supported the University's position.

41. At the close of business on October 21, 2009, Ross advised counsel that, after discussion with the Vice Provost, the University would not agree to grant the accommodation as an interim measure. She also wrote a letter explaining that "the decision of what accommodations are reasonable in the context of Princeton University's academic program is an academic judgment, which we expect will receive significant deference from any court[.]" (A copy of Ross' October 21, 2009 letter is annexed hereto as Exhibit K).

42. In her October 21, 2009 letter, Ross did not refer to the University's Undergraduate Announcement, or to a general University policy disfavoring the accommodation of extended time, or to the practice or policies of other Ivy League institutions, or to the report of the National Institute for Literacy which plaintiff had provided, or to plaintiff's explanation of the substantial limitations she faces in learning, reading, concentrating, thinking about, processing, and communicating her answers in response to a timed examination.

43. With respect to the plaintiff's request for accommodation, Ross' October 21, 2009 letter stated only that "I am confident that Diane's history, evaluations and circumstances were carefully considered by the Office of Disability Services." After noting that plaintiff had received "five accommodations to address various issues she experiences," she explained that "Princeton did conclude that extended time was not a reasonable accommodation for her issues."

44. The University's Vice Provost has not yet issued a decision in plaintiff's University appeal. On Friday, October 23, 2009, the Vice Provost wrote to plaintiff indicating that "the likely timing of my decision of your appeal is after any mid-term exams that may occur next week." (Vice Provost's October 23, 2009 letter sent via e-mail at 6:27 PM is annexed hereto as Exhibit L.)

45. To date, the complete explanation the University has given for its decision to grant certain accommodations, but not 100% extended time, is the sentence in ODS's September 3, 2009 letter: "your disability does not demonstrate that you are disabled in your ability to learn in comparison to the general population."

46. Plaintiff has learned that her first timed examination will take place on Tuesday, October 27, 2009, in Economics 100. In an advisory to all students of the course, the professor announced that the examination would be conducted Tuesday evening from 7:30 to 9:00 p.m.

He noted "You should take the time limit seriously. However, extra time can be purchased at a price of two points per minute." He also added that "some of you are entitled to extra time on the exam. If you are in this category, you will be permitted to start the exam at 6:00 p.m." (A copy of that advisory is annexed hereto as Exhibit M).

47. Plaintiff has three other timed examinations scheduled for the week of October 26, 2009.

48. Extended time is a common accommodation afforded in appropriately documented cases by colleges and universities to their undergraduate and graduate students. Peer-reviewed professional literature demonstrates its effectiveness. This accommodation has been the subject of many professional articles and books. (A copy of the June 2009 National Institute for Literacy's Learning to Achieve publication is annexed hereto as Exhibit N).

49. According to their websites, extended time is afforded in appropriately documented cases by other Ivy League institutions and by the administrators of the Graduate Record Examination and the Law School Aptitude Test. (Copies of Yale University's, Brown University's, Cornell University's, Columbia University's, Dartmouth College's, University of Pennsylvania's, and Harvard University's publications regarding their support services for disabled students are annexed hereto as Exhibit O).

## FIRST CAUSE OF ACTION – VIOLATION OF THE ADA

50. Plaintiff incorporates the allegations in paragraphs 1 through 49 of this Complaint.

51. Princeton University is a "public accommodation" affecting "commerce" within the meaning of section 301 of the ADA, 42 U.S.C. § 12181. It is therefore subject to the ADA's injunction that "No individual shall be discriminated against on the basis of disability in the full

and equal enjoyment of the goods, services, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

52. Effective January 1, 2009, the ADA defines "disability" to mean a "physical or mental impairment that substantially limits one or more major life activities of such individual" including the "major life activities" of "learning, reading, concentrating, thinking [and] communicating[.]" 42 U.S.C. § 12102(1) & (2). Princeton has violated the ADA in at least the ways described below.

53. Princeton University has acknowledged repeatedly that plaintiff is substantially limited in major life activities such as learning, reading, thinking, processing, and communicating, so that she is entitled to a series of classroom and testing accommodations, including break times during examinations and the use of "e-text" to help address her substantial reading impairment. Having reached that conclusion, Princeton University is required to justify its denial of the widely-used accommodation of extended time by showing that granting the accommodation would "fundamentally alter the nature of such . . . services[.]" 42 U.S.C. § 12182(b)(2)(A)(ii).

54. Princeton University is asserting the statutorily impermissible position that the plaintiff is disabled as to certain accommodations, but not disabled as to the accommodation of 100% extended time. It has thus avoided its burden to demonstrate the accommodation would fundamentally alter its academic program in violation of the ADA. 42 U.S.C. § 12182.

55. Princeton University further bases its claim that plaintiff's capability of "learning" is to be measured against the general population, but this claim fails in two respects. First, Princeton has failed to explain its conclusions or rebut the evidence plaintiff has submitted to it that her level of impairment is substantial relative to the general population. In meetings with

the plaintiff, Princeton representatives thwarted opportunities to address the evidence by repeatedly invoking "University policy" and "Ivy League policy." Second, under the ADA Amendments Act of 2008, "learning" is no longer the only relevant "major life activity." Plaintiff has shown substantial limitations on her ability to read, think, concentrate, and communicate. Princeton's "finding" completely fails to address the evidence regarding these limitations, in violation of the ADA.

56. Princeton's "general population" standard derives from the decision of the U.S. Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). The ADA Amendments Act of 2008 provides that, effective January 1, 2009, Congress "reject[s] the standards enunciated in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled; and that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance *to most people's daily lives*'[.]" Pub. L. 110-325 § 2(b)(4), 122 Stat. 3553, 3554 (2008) (emphasis added). In determining plaintiff not to be disabled with respect to the general population, Princeton has followed an impermissible legal standard in violation of the ADA.

**WHEREFORE,** Plaintiff demands judgment in her favor against Princeton University and requests that this Court award relief as follows:

    i. Ordering Princeton University to grant Plaintiff 100% extended time for all examinations;

    ii. Awarding costs and attorneys' fees; and

      iii.      Awarding additional relief at law of equity to which Plaintiff may be entitled.

_____
SETH J. LAPIDOW
New Jersey Resident Partner
BLANK ROME LLP
A Pennsylvania LLP
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
(609) 750-7700 (Phone)
(609) 750-7701 (fax)
*Attorneys for Plaintiff*
*Diane E. Metcalf-Leggette*

Dated: October 26, 2009

## VERIFICATION

I, Diane E. Metcalf-Leggette, hereby verify under penalty of perjury that the factual allegations in the foregoing paragraphs are true and correct.

_____
Diane E. Metcalf-Leggette

Dated: October 26, 2009

## VERIFICATION

I, Kathleen Leggette, hereby verify under penalty of perjury that the factual allegations in the foregoing paragraphs are true and correct.

_____
Kathleen Leggette

Dated: October 26, 2009

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I certify that the matter in controversy in this action is not the subject of any other action pending in any Court, or of any pending arbitration or administrative proceeding.

                                                                     /s/ Seth Lapidow
                                                                     SETH LAPIDOW
                                                                     JONATHAN M. KORN
                                                                     New Jersey Resident Partners
                                                                     BLANK ROME LLP
                                                                     A Pennsylvania LLP
                                                                     301 Carnegie Center, 3rd Floor
                                                                     Princeton, NJ 08540
                                                                     (609) 750-7700 (Phone)
                                                                     (609) 750-7701 (fax)
                                                                     *Attorneys for Plaintiff*
                                                                     *Diane E. Metcalf-Leggette*

Dated: October 26, 2009